UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* RICHARD DRUMMOND and | § | Civil Action No. H-08-2441 |
| STATE OF TEXAS *ex rel.* RICHARD DRUMMOND, | § | |
| *Plaintiffs* | § | |
| v. | § | |
| BESTCARE LABORATORY SERVICES LLC, and KARIM A. MAGHAREH, | § | |
| *Defendants*. | § | |

**UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER THE FALSE CLAIMS ACT AND SUPPORTING MEMORANDUM**

The United States seeks partial summary judgment on the P9603 claims for 400 miles or more that BestCare submitted to Medicare from August 4, 2005, through June 30, 2008. These claims are all false because no technician traveled 400 miles, and thus BestCare was not entitled to payment of such claims. As discussed below, BestCare knowingly made, and Karim A. Maghareh knowingly caused BestCare to make, such false claims in violation of the False Claims Act. 31 U.S.C. § 3729 *et seq.*

**NATURE AND STAGE OF PROCEEDING**

This *qui tam* action was filed on August 6, 2008. The United States intervened, seeking recovery of millions of dollars of Medicare funds that Defendants obtained through their fraudulent billing practices. The action centers on Medicare billing code P9603, which is used by laboratories to claim compensation for certain expenses incurred when the laboratory elects to send a technician to collect a specimen from a nursing home or homebound Medicare

beneficiary.[1] Defendants falsely billed Medicare by billing for millions of miles that no technician traveled.

Defendants knew what they were doing. Contrary to the statute authorizing payment by Medicare to labs for technicians to travel to collect test specimens from nursing homes or homebound patients, despite the express terms of P9603 (allowing claims only for "miles actually traveled") and in total disregard of the unambiguous regulatory guidance warning that "[a]t no time will the laboratory be allowed to bill for more miles than are reasonable or for miles not actually traveled by the laboratory technician," Defendants billed Medicare for millions of miles their technicians never actually traveled, and wrongfully received millions of dollars of taxpayer money. Although Defendants carefully tracked and paid their technicians for miles actually traveled, they disregarded these figures when billing Medicare for exponentially greater amounts.

Many of the miles for which Defendants billed involved not technician travel, but the distance that BestCare shipped test specimens, as air cargo, from distant nursing home locations in El Paso, San Antonio and Dallas to the BestCare lab in Webster, Texas. In other words, Defendants billed for test specimens "travel" and "trips" (not for "miles . . . actually traveled by [a] laboratory technician"), when as a matter of law, no such "test tube travel" or "trips" are billable under P9603 (or otherwise).

Most flagrantly, however, Defendants submitted false claims to Medicare for miles that not only were not traveled by a technician, but that were not even "traveled" by a specimen. Defendants did this in two ways: first, by falsely representing that roundtrip "travel" had

[1] Subsection (h) of 42 U.S.C. § 13951 authorizes Medicare to pay laboratories a fee to cover the transportation and personnel expenses for trained personnel to travel to the location of an individual to collect a sample. The billing code implementing the statute is P9603: "[t]ravel allowance one way in connection with medically necessary laboratory specimen collection drawn from home bound or nursing home bound patients; prorated miles actually traveled." *See* Doc. 92-1 and Doc. 93, p. 2, for a detailed discussion of the code.

occurred when a specimen was shipped in only one direction from a distant lab to Defendants' lab in Webster, and second, by falsely billing for roundtrip mileage between nursing homes in Dallas and San Antonio and the Webster lab when, in fact, the specimens were tested locally at defendants' labs in Dallas and San Antonio and barely "traveled" at all.

Pending before the Court is the United States' Motion for Partial Summary Judgment, Doc. 87, which addresses the common law claims asserted by the United States, and the Defendants' Motion for Summary Judgment, Doc. 91. The pending motion of the United States, and its opposition to Defendants' motion, contain extensive briefing on the rules governing P9603, which will not be repeated at length here.

While there is overwhelming evidence of Defendants' brazen misconduct as to P9603 mileage claims in varying amounts through at least 2010, the United States seeks partial summary judgment under the False Claims Act on a subset of BestCare's P9603 claims, namely, claims for 400 miles or more made from August 4, 2005, through June 30, 2008. No BestCare technician traveled 400 or more miles to collect a specimen, and no specimen took a 400 mile "round trip". All of these claims, on the undisputed facts and as matter of law, are knowingly false under the FCA.

**STANDARD OF REVIEW**

Summary judgment is appropriate when there is no genuine dispute as to any material fact. A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In making its determination, the court must draw all inferences in favor of the nonmoving party. *Id.* at 255. However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith*

*Radio*, 475 U.S. 574, 586 (1986). "The plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257.

The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. The court's function is to determine whether there is a genuine issue for trial. *Id.* at 247-48.

The standard for determining whether summary judgment should be granted "mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250. The question is not whether literally some small amount of evidence exists, *i.e.*, a scintilla or less, but whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury. *Id.* at 252.

**STATEMENT OF UNDISPUTED FACTS**

1. Dr. Karim Maghareh founded BestCare in 2002 as a subchapter S corporation. He owns 51% of BestCare. His wife, Farzaneh Rajabi, owns 49% and manages the business' money. Doc. 87-2, pp. 10, 31-33.

2. Maghareh is the president and the CEO of BestCare. *Id.* at 72. He has a Ph.D. in health care administration and an MBA with a concentration in health care. *Id.*, pp. 21, 22, 77.

3. BestCare has or has had, at various times, nursing home clients throughout Texas, including nursing homes in or around El Paso, Dallas, Waco, and San Antonio. It also has clients in the greater Houston area. *Id.*, pp. 38-44.

4. BestCare's main lab is in Webster, Texas. *Id*. at 35

5. BestCare opened a lab in San Antonio on April 6, 2006. BestCare opened a lab in Dallas on February 21, 2007. *Id.* Both labs were capable of performing tests of "moderate complexity." Maghareh Affidavit, Ex. A.

6. BestCare's technicians in Dallas, San Antonio, Waco and El Paso traveled locally to obtain specimens. BestCare paid them approximately 45 cents per mile for their travel. Doc. 87-2 at 150.

7. No technician traveled to Webster from San Antonio, Dallas, Waco or El Paso. *Id*., pp. 175-176.

8. The specimens were taken to local airports and shipped by air to Houston, at a cost to BestCare of approximately $100. *Id.*, pp. 171-173.

9. Dallas is approximately 270 driving miles from Webster, Texas. San Antonio is approximately 220 driving miles from Webster, Texas. El Paso is approximately 760 driving miles from Webster, Texas.

10. BestCare billed Medicare for numerous purported round trips exceeding 400 miles for tests of specimens from beneficiaries living in greater San Antonio, Dallas, Waco and El Paso. From August 4, 2005 through June 30, 2008, BestCare submitted at least 24,798 P9603 claims to Medicare for 400 miles or more. Medicare paid BestCare $10,190,545.00 for these claims. Petron Declaration, Ex. B.

11. No patient specimen that was shipped or transported from BestCare's Dallas, San Antonio or El Paso facilities to its Webster laboratory was ever shipped or transported back from Webster to Dallas, San Antonio or El Paso. Ex. C, p. 107; Ex. D, pp. 184-185; Ex. E, p. 73; Ex. F, pp. 176, 189, 201-202.

12. No BestCare technician ever traveled from Webster to Dallas, San Antonio or El Paso. Ex. C, p. 107; Ex. D, pp. 184-185; Ex. E, p. 73; Ex. F, pp. 176, 189, 201-202.

13. When BestCare billed P9603 mileage exceeding 400 miles, it routinely billed round trip mileage, as indicated by the "LR" modifier. Doc. 87-3, para. 9. Even when such billing was for the mileage that specimens were shipped, the specimens were only shipped one-way. Doc. 92-3, p. 185.

14. At all times relevant, HCPCS Code P9603 was defined as "[t]ravel expense one way in connection with medically necessary laboratory specimen collection drawn from homebound or nursing home bound patient; prorated miles actually travelled." Doc. 92-1.

15. At all times relevant to this case, the Medicare Part B carrier for Texas was Trailblazer Health Enterprises. Trailblazer's 2002 Laboratory and Pathology Manual advised labs that "the travel allowance [P9603] is intended to cover the estimated cost and technician's salary associated with collecting the specimens" and states that no allowance may be made "when the laboratory technician merely performs a messenger service to pick up specimens drawn by a physician or nursing home personnel." Doc. 87-4, pp. 2-3.

16. In June 2007, Trailblazer added to its manual the admonition that "[l]aboratories will not be allowed to bill for more miles than are reasonable *or*

*for miles not actually traveled by the laboratory technician*." Doc. 87-5, p. 14 (emphasis added). The same admonition was included in the CMS Claims Processing Manual (CMS Manual) from as early as 2003, the year after BestCare was founded. *See* Doc. 22-8, p. 94 of 151 (CMS Manual, rev'd. 10-1-03).

17. Maghareh does not recall doing anything himself to determine the correct way to bill Medicare under billing code P9603. Doc. 93-1, p. 161. He never read the description of P9603. *Id.,* pp. 142-143. He did not read the 2007 Trailblazer manual until after discovery began in this litigation, nor did he read the 2009 Trailblazer manual. *Id.,* pp. 154-156.

18. Maghareh did not know whether Martha Shirali, the woman he hired in September 2003 to do BestCare's billing, had any experience with laboratory billing. She did not. Doc. 92-3, p. 50. Maghareh did little to supervise her. *Id.,* pp. 91, 98-99.

19. Maghareh and his wife taught Shirali how to bill P9603. They told her to bill the round trip distance from the nursing home to the Webster lab, without regard to the miles actually traveled by a technician. Doc. 92-3, pp. 50-51, 118, 181-182. Examples of the "facility mileage" sheets produced by BestCare are attached as Ex. G.

20. Shirali reported directly to Maghareh. Doc. 87-2 at 94.

21. In order to submit claims to Medicare, and to be paid from the Medicare trust fund, providers must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The agreement (Medicare Federal Healthcare Provider/Supplier Enrollment Application, CMS form 855B) contains a certification statement in which the provider agrees, *inter alia,* that he will abide by Medicare laws, regulations and program instructions, that he understands that payment of a claim is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions, and on its compliance with all applicable conditions of participation in Medicare. The provider also agrees that he will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

22. On December 1, 2001 and again on October 14, 2003, Maghareh signed CMS form 855B on behalf of BestCare. Ex. H.

23. Each P9603 claim by BestCare was signed by Maghareh. Ex. F, p. 183; Ex. I (sample claim signed by Maghareh).

## ARGUMENT

### A. The False Claims Act.

The False Claims Act ("FCA" or "Act"), 31 U.S.C. § 3729 *et seq.*, prohibits persons from "knowingly" presenting or causing to be presented to the United States "a false or fraudulent claim for payment or approval" and from knowingly using false statements to get false claims paid. 31 U.S.C. § 3729 (a)(1), (2). In order to prevail, the United States must prove (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due. *United States ex rel. Longhi v. Lithium Power Technologies*, 575 F. 3d 458, 468 (5th Cir. 2009).

To act "knowingly" under the Act, a person must have presented the claim or made the statement with actual knowledge of its falsity, with deliberate ignorance of the truth or falsity, or with reckless disregard of the truth or falsity. 31 U.S.C. § 3729 (b). The statute expressly does not require proof of specific intent to defraud. *Id.* Congress intended for the statute to cover persons who refuse "to learn of information which an individual, in the exercise of prudent judgment, had reason to know." *UMC Electronics Co. v. United States*, 43 Fed. Cl. 776, 793 (Fed. Cl. 1999) (quoting S. REP. No. 99-345, at 21 (1986)).

"Reckless disregard" under the FCA is measured by an objective standard; and thus "may be established without reference to the subjective intent of the defendant." *United States v. Krizek,* 111 F.3d 934, 942 (D.C. Cir. 1997). Courts therefore may adjudicate reckless disregard at the summary judgment stage of an FCA action, even where a defendant disputes whether he acted with the requisite intent.

**B. Defendants knowingly made false claims by representing that BestCare's technicians traveled millions of miles that they did not travel.**

The authorizing statute, quoted above at note 1 and discussed in the United States' earlier motion and opposition papers, authorizes payment for technician travel. The code, P9603, by its express terms, permits billing for "miles actually traveled." At all times pertinent, the Medicare Part B carrier for Texas was Trailblazer Health Enterprises. The 2002 Trailblazer Laboratory and Pathology Manual advised labs that "the travel allowance [P9603] is intended to cover the estimated cost and technician's salary associated with collecting the specimens" and states that no allowance may be made "when the laboratory technician merely performs a messenger service to pick up specimens drawn by a physician or nursing home personnel."

In June 2007, Trailblazer added the admonition, tracking the language of the code, that "[l]aboratories will not be allowed to bill for more miles than are reasonable *or for miles not actually traveled by the laboratory technician*." (Emphasis added.) The same admonition was included in the CMS Claims Processing Manual (CMS Manual) from as early as 2003, the year after BestCare was founded. *See* Doc. 22-8, p. 94 of 151 (CMS Manual, rev'd. 10-1-03). The code and the Trailblazer and CMS manuals are clear to anyone billing in good faith. Medicare pays for technician travel when a lab elects to send a technician to the beneficiary because the beneficiary is in a nursing home or otherwise unable to travel to the lab or other collection site. The purpose of the trip must be for the technician to collect the specimen, *e.g.*, to draw blood or obtain a urine sample by catheterization. Medicare does not separately pay for courier services, nor does it pay separately for the cost of shipping specimens. *See* Doc. 87, pp. 7-9 9 for discussion of pertinent CMS Manual and Trailblazer manual provisions. To the extent that a lab seeks to cover its shipping costs, or its costs such as rent or insurance, or salaries and benefits, or test tubes and reagents, or the myriad of other business expenses that a lab may incur, but which

*are not directly covered by Medicare,* it must do so from the overall compensation it receives *for the tests* it performs.

The CMS and Trailblazer manuals leave no room for creative interpretation. To collect a travel allowance fee under P9603, a technician must travel to collect a specimen and a lab can only bill for the miles the technician actually travels to do so.

Maghareh admits that BestCare made round-trip claims for more than 400 miles under P9603, when BestCare shipped the specimens by air, no technician traveled 400 miles to collect a specimen, and no technician traveled to his Webster lab. Doc. 87-2, pp. 175-176.

Beginning on August 4, 2005 through June 30, 2008, BestCare made 24,798 false or fraudulent P9603 claims for 400 miles or more – miles that no technician traveled.[2] Medicare paid BestCare $10,190,545.00 for those claims. Petron Declaration, Ex. B.

When Martha Shirali went to work for BestCare, Maghareh told her that he made most of his money from billing for miles. Doc. 93-2, p. 89. This fact alone supports the conclusion that Maghareh acted, at a minimum, with reckless disregard for the truth of BestCare's claims to Medicare, as no reasonable person acting in good faith – judged by an objective standard – could believe that Medicare would pay, for example, $31,834.62 for 41,144 miles of purported technician travel in a single day when the technicians in fact drove only 1,395.7 miles. Doc. 74-6, p. 3. However, in order to prevail, the United States need not prove that Defendants acted with specific intent. The United States need only prove that they acted with reckless disregard or deliberate ignorance of the rules.

2 Maghareh maintains that in a telephone call on July 8, 2008, Trailblazer customer service representative Dean Richardson told BestCare employee Kari McIntire that BestCare could bill P9603 for mileage that specimens were shipped as air cargo, unaccompanied by a technician. Of course, this advice, if given, would have been legally incorrect and contrary to all of the other unambiguous guidance available to Defendants. Specimens do not "travel" or take "trips" for purposes of P9603. Thus, such advice would be immaterial to the question of the knowing falsity of BestCare's claims. In any event, since Mr. Richardson denies that he gave such advice, to render moot this (immaterial) factual dispute, the United States has limited its motion for summary judgment to P9603 claims of 400 miles or more made by BestCare prior to the disputed phone call with Mr. Richardson.

The requisite degree of knowledge under the FCA is discussed at length in *Krizek*. The District of Columbia Circuit found that a physician acted with reckless disregard when he delegated billing authority to his wife and a billing clerk, and completely failed to review the bills they submitted on his behalf:

> The question, therefore, is whether "reckless disregard" in this context is properly equated with willful misconduct or with aggravated gross negligence. In determining that gross negligence-plus was sufficient, the District Court cited legislative history equating reckless disregard with gross negligence. A sponsor of the 1986 amendments to the [False Claims Act] stated:
>
> > Subsection 3 of Section 3729(c) uses the term "reckless disregard of the truth or falsity of the information" which is no different than and has the same meaning as a gross negligence standard that has been applied in other cases. While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government. The Act is also intended not to permit artful defense counsel to require some form of intent as an essential ingredient of proof. This section is intended to reach the "ostrich with-his-head-in-the-sand-problem" where government contractors hide behind the fact they were not personally aware that such overcharges may have occurred. This is not a new standard but clarifies what has always been the standard of knowledge required.
> >
> > 132 Cong. Rec. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Berman).
>
> While we are not inclined to view isolated statements in the legislative history as dispositive, we agree with the thrust of this statement that the best reading of the Act defines reckless disregard as an extension of gross negligence.

*Krizek*, 111 F. 3d at 941-942. *See also United States v. TDC Management Corp., Inc.*, 24 F. 3d 292, 297 (D.C. Cir. 1994) (FCA encompasses more than "actual knowledge"; to construe the Act more narrowly would readily permit parties to evade liability through deliberate ignorance or careless disregard of the accuracy and veracity of their claims); *UMC Electronics Co. v. United States*, 43 Fed. Cl. 776, 794 (1999) (FCA requires only that government prove that party

submitted claim with reckless disregard to falsity of the information); *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F. 3d 29 (6th Cir. 1998) (court found reckless disregard for falsity of invoices for brake shoe kits and granted FCA summary judgment; brake shoes were not tested as required by contract)*; United States v. Lorenzo*, 768 F. Supp. 1127, 1131 (E.D. Pa. 1991) (reckless disregard where dentist's claims forms to Medicare insurance intermediary prepared so as to disguise routine dental checkups as "limited consultations" for cancer exams).

Assuming, *arguendo,* Maghareh knew the rules for billing P9603, like Dr. Krizek, he failed to supervise his staff to insure they were billing appropriately. However, Maghareh has no recollection of making any effort to learn the rules. Doc. 93-1, p. 161. As the CEO of BestCare, as the responsible party on the Medicare enrollment agreement, and as the signatory on all of BestCare's claims, Maghareh had a duty to know the rules himself or at the very least to make sure that his staff was following the rules. He admittedly did neither.

In submitting claims to Medicare, providers must certify that the information on the claims forms presents an accurate description of the services rendered and that the services were reasonably and medically necessary for the patient. 42 U.S.C. § 1320c-5(a)(2). Indeed, each claim Maghareh signed on behalf of BestCare provided "[t]his is to certify that the foregoing information is true, accurate and complete." *See* Ex. I for an example of a claim form signed by Maghareh.

Despite Maghareh's obligation to bill accurately, and his representation that he was doing so, he allowed millions of dollars of false P9603 claims to be billed under his signature and authority. This is, at best, reckless disregard. His utter failure to know the rules for the code that he knew was generating the bulk of his income is, at best, deliberate ignorance. Thus, Maghareh

is personally liable under the False Claims Act for knowingly causing the submission of BestCare's false claims under code P9603.

**C. A subset of the miles included in the 400+ mile claims for which the United States seeks damages are miles that were not even "traveled" by a specimen. BestCare wholly fabricated these miles, which is evidence of specific intent to defraud the United States or, at least, reckless disregard.**

**1. BestCare falsely represented the distance that specimens were shipped by claiming "round trip" specimen "travel."**

It is undisputed that BestCare only shipped specimens as air cargo <u>from</u> San Antonio, Dallas, Waco or El Paso <u>to</u> its lab in Webster. For obvious reasons, no blood, urine, stool, or other types of specimens tested by BestCare were ever shipped *back* from Webster to the nursing homes in San Antonio, Dallas, Waco or El Paso. Despite this, BestCare routinely added the "LR" modifier to all of its P9603 claims, indicating that a "test tube roundtrip" occurred. Doc. 87-3, para. 9. By using the "LR" modifier, Defendants doubled the number of phantom miles they fraudulently submitted to Medicare. Even if Defendants could believe in good faith that P9603 could be used to bill for the distance specimens were shipped (which they could not), they did not just bill for that distance. They doubled it. Every such claim for "roundtrip" "test tube travel" mileage is false.

Defendants did not make an innocent mistake. Defendants falsely represented to Medicare that roundtrip "test tube travel" occurred between San Antonio, Dallas, Waco or El Paso and Webster, when no return "travel" or "trip" by the specimens ever occurred. Defendants had actual knowledge that they billed for "travel" or "trips" – for the distance from Webster to distant nursing homes in El Paso, Dallas, Waco and San Antonio – that never occurred. In doing so, Defendants knowingly made false claims in violation of the False Claims Act.

**2. After BestCare opened laboratories in Dallas and San Antonio, BestCare continued to bill for testing on area beneficiaries as if the**

**specimens had been shipped to Webster.**

Despite the fact that BestCare had a lab in San Antonio as of April 2006, for over a year after the lab opened, BestCare billed the vast majority of claims for its San Antonio area beneficiaries as if the tests had been performed in Webster. For example, in December 2006, BestCare submitted 550 claims for San Antonio area beneficiaries. Of those claims, all but one was for 400 miles or more. The percentage of 400+ miles claims to the total ranged from 95% to 98% through July 2007, with the exception of February and March (68% and 75%, respectively). *See* Petron Declaration, Ex. B. The pattern is the same for Dallas area testing. *Id.*

There are only two possible explanations for this pattern. BestCare either performed routine tests in its San Antonio and Dallas labs, but billed them as if the specimens had been tested in Webster; or BestCare conducted the routine tests in Webster in order to bill miles. Either explanation is indicative of specific intent to defraud Medicare.

The first explanation is the most likely, as it would make no sense for BestCare to invest in laboratories in San Antonio and Dallas and not use them. This explanation is also supported by the testimony of Leigh Del Rio, who testified that she learned from a casual conversation with a lab technician that tests that she thought were being run in Webster were actually being run in San Antonio and Dallas. Doc. 93-3, pp. 28-30. When she asked Maghareh how to bill for the tests being done in San Antonio and Dallas, he told her to "bill it like they always do," meaning to bill it as if the tests were done in Webster. *Id.*

**D. The actual travel of BestCare technicians for three randomly selected days compared to the miles billed for their purported travel shows the egregiousness of BestCare's P9603 billing practices and the inherent unreasonableness of its P9603 claims. The claims bear no relationship whatsoever to the cost BestCare incurred in sending technicians to collect specimens.**

A provider may only bill Medicare for services that are reasonable and necessary. 42

U.S.C. §1395y(a)(1)(A). BestCare's P9603 claims are not reasonable by any measure. Not only do such claims fail to reflect miles actually traveled, as required by the statute, code and manual guidance, but they seek compensation that bears no relationship to the per-mile expense that BestCare incurred in sending technicians to collect specimens, *i.e.*, the technician salary associated with such travel plus the federal mileage rate to compensate for use of their vehicles – as the computation of the travel allowance fee is explained in the CMS manual. Doc. 87-6, p. 6.

In the early days of this litigation, the United States asked BestCare to provide technician mileage logs and associated documents regarding technician activity for three randomly selected days: March 6, 2006; July 17, 2007 and April 2, 2008. An examination of the technician mileage logs shows the degree to which Maghareh exploited P9603 by allowing BestCare to falsely represent that technicians traveled thousands of miles that they did not in fact travel, enriching himself in the process.

BestCare provided mileage logs of 12 technicians for travel on March 6, 2006. They collectively reported 1,395.7 miles of travel, but BestCare represented in its claims to CMS that its technicians traveled 41,144 miles and was paid $31,834.62 for those phantom miles. That is approximately 26 times more than the amount to which BestCare was entitled: $1234.65. Doc. 74-6, p. 3.

On July 19, 2007, BestCare technicians collectively drove a total of 2087.10 miles. [3] Thus, BestCare could properly have billed for no more than 2087 miles for that day. However,

---

3 BestCare provided mileage logs for 19 technicians for travel on July 19, 2007. We arrived at the number 2087.10 by adding all the miles these technicians reported for that day. *See* Doc. 74 for the logs, and the standing orders from the nursing homes which appear to correlate to each technician's travel.

1. Nicole Flores – 75 miles (San Antonio)
2. Inez Lopez – 66 miles (San Antonio)
3. Melissa DelaCruz – 37 miles (San Antonio)
4. Joe Puente – 35 miles (morning) and 80 miles (afternoon) - (San Antonio)
5. Wende Ward (Waco) – 111 miles (2:30 – 10:00) and 13 miles (12:00 – 12:45)

BestCare claimed 46,170 miles. BestCare received $35,861.00, when it was only entitled to $1,961.00. *Id.*, p. 4. Given that BestCare paid its technicians $.45 per mile, BestCare paid the nineteen technicians approximately $939.00 for their travel. Billing Medicare $35,861.00 for a service with an out of pocket cost of $939.00 is not reasonable. It is reckless and fraudulent.

BestCare provided mileage logs for the April 2, 2008 travel of 24 technicians. They collectively reported 2,426.5 miles of travel. However, BestCare billed Medicare for 22,605 miles. *Id.*, p. 5.

These are examples of but three days' worth of false P9603 claims. They show the egregiousness and falsity of BestCare's billing practices. Maghareh used P9603 to amass huge, undeserved, unlawful profits. As he told Shirali when he hired her, he made most of his money from billing under P9603. He was right. BestCare was more in "the business of mileage" than it was a clinical lab. That is, of the $34.87 million that BestCare received from Medicare from 2002 to 2009, 69% was attributable to P9603 claims for millions and millions of phantom miles. Doc. 87-3, para. 9.

---

6. Maria del Carmen Aguirre - 66 miles (Houston)
7. Rosa Bernal – 92.7 miles (Houston)
8. LaQuisha Butler – 231 miles (Houston)
9. Janie De la Cruz – 126 miles (Houston)
10. Alecia Etienne – 3 miles
11. Gina Fulco – 157 miles (Houston)
12. Veronica Garcia – 123 miles (Houston)
13. Laura Maldonado – 161.7 miles
14. Shantrese Montgomery – 121 miles (Houston)
15. Geneva Phillips – 62.7 miles (Houston)
16. Mohammed Rafi – 269 miles (Houston)
17. Netta Trahan – 153 miles (Houston)
18. Antoinette Young – 69 miles (Houston)
19. Addrian Taylor – 35 miles (Dallas)

**E. The United States is entitled to an FCA judgment of $30,571,635.00.**

The FCA mandates an award of treble damages to the United States. 31 U.S.C. §3729(a). Thus, the United States is entitled to a judgment against both Defendants of $30,571,635.00, based on single damages of $10,190,545.00 for false claims of 400 miles or more submitted by Defendants from August 4, 2005 through January 26, 2010, in violation of the FCA[4]

## CONCLUSION

Proper billing of P9603 is not hard to understand: A lab may bill Medicare for the miles its technicians actually travel to collect specimens from nursing home or homebound Medicare patients. The billing must be reasonable.

On a daily basis, BestCare billed Medicare for thousands of miles not traveled by its technicians. Many of these miles were not even "traveled" by a specimen, although BestCare repeatedly billed for "specimen round trip travel." BestCare received approximately a dollar for each of these untraveled and unshipped miles, paid its technicians $.45 for the relative handful of miles the technician actually traveled, and pocketed the rest – many millions of dollars of ill-gained taxpayer money.

The uncontroverted evidence is that Maghareh made no effort whatsoever to bill properly. If he read the rules, he chose not to follow them. If he did not read them, he acted with deliberate ignorance when he allowed his staff to bill Medicare for millions of dollars of claims which formed the core of his business and which exceeded the bounds of any reasonable reading of the rules.

---

4 The FCA also provides that a person who commits any of the acts specified in 31 U.S.C.§ 3729(a)(1)-(7) is liable for a civil penalty of not less than $5,500 and not more than $11,000 per false claim. 31 U.S.C. § 3729(a)(7). Because of the size of the treble damages judgment due the United States, and the unlikelihood of Defendants being able to satisfy that judgment, we do not at this time ask the Court to impose FCA penalties.

Defendants routinely billed Medicare for "round-trip" miles when specimens were shipped just one way, and repeatedly billed for routine tests that could have been (and undoubtedly were) done in its San Antonio and Dallas labs, as if the tests had been done in Webster. Most fundamentally, Defendants billed for millions of miles no technician traveled, when technician travel is the foundation of P9603. Defendants had actual knowledge that such claims were false.

There is no issue for trial. Defendants cannot, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury. There is only one reasonable verdict a jury could reach: Maghareh, through BestCare, knowingly made millions of dollars of claims to Medicare that were false, because they were billing for miles that no technician traveled. The United States is entitled to summary judgment against Maghareh and BestCare, jointly and severally, in the minimum amount of $30,571,635.00.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

KENNETH MAGIDSON
United States Attorney

By: s/ Michelle Zingaro________
MICHELLE ZINGARO
Assistant United States Attorney
State Bar No. 12345500
Fed. Bar No. 14463
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9512

ATTORNEYS FOR THE
UNITED STATES

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2014, the United States'' Motion for Partial Summary Judgment under the False Claims Act was filed electronically and service accomplished automatically pursuant to the Rules of Court through the Notice of Electronic Filing (NEF) issued by the Courts Electronic Case Filing (ECF) system on the following counsel of record:

Mitchell R. Kreindler
Melissa Neiman
KREINDLER & ASSOCIATES
9219 Katy Freeway, Suite 206
Houston, Texas 77024-1415
mkreindler@blowthewhistle.com
mneiman@blowthewhistle.com
Attorneys for Qui Tam Relator
Richard Drummond

David James Manley
11811 North Frwy., Suite 512
Houston, TX 77060
dmanleylaw@aol.com
Counsel for Defendant Karim A. Maghareh

Susan J. Arenella
Assistant Attorney General
Office of the Texas Attorney General
Civil Medicaid Fraud Division
PO Box 12548
Austin, Texas 78711-2548
susan .arenella@oag.state.tx.us
Counsel for the State of Texas

Mark Stephen Armstrong
EpsteinBeckerGreen
Two Houston Center
909 Fannin, Suite 3838
Houston, TX 77010
marmstrong@ebglaw.com
Counsel for Defendant BestCare
Laboratories, Inc.

By agreement of Counsel, service on the following persons who are not registered with the ECF system was also accomplished via the NEF issued by the ECF System:

William F. Gould
Holland & Knight
1600 Tysons Boulevard, Suite 700
McLean VA 22102
william.gould@hklaw.com
Counsel for Defendant Karim A. Maghareh

s/ Michelle Zingaro
Michelle Zingaro